UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOYCE WAGENMAKER<br>Plaintiff<br><br>v.<br><br>AMICA MUTUAL INSURANCE COMPANY | : | C.A. No. 08-41T |
| SAFECO INSURANCE COMPANY OF ILLINOIS<br>Plaintiff<br><br>v.<br><br>AMICA MUTUAL INSURANCE COMPANY and JOYCE WAGENMAKER | : | C.A. No. 08-145S |

**PLAINTIFF JOYCE WAGENMAKER'S MEMORANDUM IN SUPPORT OF HER OBJECTION TO AMICA MUTUAL INSURANCE COMPANY'S MOTION FOR SUMMERY JUDGEMENT AND PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

There are times when what is omitted from an argument speaks much louder than what is included. This is one of those times. While submitting a Memorandum in support of its Motion for Summary Judgment that is full of words and citations to various court opinions, Amica has failed to address with any measure of depth the careful analysis that Ms. Wagenmaker, through her counsel, prepared and tendered to Amica in support of her claims for UM coverage. This analysis is embodied in her counsel's letter of November 5, 2007 to David Reifel, an Amica Senior Claims Supervisor ( copy of which is annexed hereto as Exhibit A and incorporated herein by reference) Having gone

so far as to include a copy of this letter as an exhibit to its Memorandum[1], Amica ultimately resisted what should have been a strong urge to address in a professional and straightforward manner the arguments set forth in that letter so the Court could decide this matter with the benefit of a full record. Instead, Amica made several vague references to what Ms. Wagenmaker "may contend" while avoiding with such precision and consistency that the intentional quality of its avoidance is palpable, the need to address the analyses and resultant arguments that Wagenmaker ***did*** make in that letter. Accordingly, after clarifying the law that guides this Court's task, Ms. Wagenmaker will turn to the arguments that she tendered to Amica last November, and which still support her claim for relief in this action.

## UNDISPUTED FACTS

Ms. Wagenmaker will not encumber the submissions by including a comprehensive statement of undisputed facts that reiterates many of those Amica has submitted. Of course, Ms. Wagenmaker submits that most of the undisputed facts included in Amica's submission have no bearing whatsoever on the controversy between her and Amica, relating, instead, to that between Vitone and Amica.[2] Accordingly, for purposes of this Motion, Wagenmaker incorporates by reference the following facts from Amica's statement: Numbers 1, 27, 28, 29, 32, 37, 38, 39, 40 and 41.[3] Wagenmaker

---

[1] Amica has attached Plaintiff's Complaint as an exhibit to its Memorandum. This letter is an exhibit to Plaintiff's Complaint.

[2] As Amica's Statement of Undisputed Facts reveals, at the time of the collision which underlies this action, Ms. Wagenmaker was a passenger in a 1998 Chevrolet Corvette owned and operated by another party to these proceedings, Vito Vitone. In October, 2004,Vitone had removed the Corvette from all coverages except for "Other Than Collision Loss" on his policy with Amica. He, too, has sought UM coverage from Amica. As the Policy's terms treat Vitone's situation quite differently from Ms. Wagenmaker's, many of Amica's undisputed facts have no bearing on her claims in this action.

[3] Having adopted these Statements of Undisputed Fact, Wagenmaker will refer in this Memorandum to the vehicle in which she was injured as the "Vitone Vehicle" and the Amica policy which this Court must construe as the "Policy". Wagenmaker also adopts Amica's analysis of the standard of review.

specifically rejects any suggestion that Number 42, which suggests that Amica properly denied coverage for her UM claim under the Policy, is in any way "undisputed". Finally, Wagenmaker offers the following additional undisputed facts:

1. By letter of November 5, 2007 (Exhibit A hereto), Ms. Wagenmaker's counsel sent to David Reifel, a Senior Claims Supervisor for Amica, a detailed analysis of the reason that she is entitled to UM coverage under the Policy for the injuries in issue;

2. By letter of November 9, 2007 (copy annexed hereto as Exhibit B), Reifel acknowledged receipt of Exhibit A, and indicated that Amica was reviewing the points that counsel made in his letter and that Amica would respond "shortly";

3. By letter of December 5, 2007, (copy annexed hereto as Exhibit C and incorporated herein by reference) Mr. Reifel responded to counsel's letter of November 5;

4. Amica has never (including in its Memorandum of Law submitted in connection with this Motion) addressed "the points that counsel made in his letter", Exhibit A.

## THE APPLICABLE LAW.

Some authors have a tendency to fill a legal memorandum with many citations. To be sure, when there are many points that require support, and when that support is found in a variety of opinions, it is appropriate for counsel to direct the Court's attention to volumes of caselaw. When there are many points that require support and that support can be found in one or two opinions, the Court's resources should be conserved and its focus enhanced by directing its reference only to those opinions.

Here, Amica suggests to this court that an insurance policy should be construed in its entirety with its provisions applied according to their clear, plain and ordinary meaning to determine and give effect to the parties' intent. When that is not possible because the provisions are ambiguous, the language is then to be construed against the

insurer as the drafter—although a court should not strain to find an ambiguity where one does not exist. That is the heart of everything Amica offers as legal support for its position. To support these propositions, Amica cites eight decisions of the Rhode Island Supreme Court. In reality, one of the cited cases establishes ***all*** of these points—although it says ***nothing*** about the proposition for which Amica cites it.[4] Ms. Wagenmaker turns now to a discussion of this unfortunate situation.

At p. 19 of its Memorandum, Amica states that "when interpreting an insurance policy or any contract, all documents relating to them are to be, where possible, construed as a harmonious and consistent whole." In support, Amica cites *McGowan v. Connecticut General Life*, 110 R.I. 17, 19 (1972) and *Textron, Inc v. Aetna Casualty and & Surety Co.*, 638 A.2d 537, 539 (R.I. 1994). ***Neither*** case supports that proposition; indeed, neither case even discusses that proposition. Rather, ***both*** cases reiterate the longstanding rule in Rhode Island that the construction of an insurance policy is to be limited to what is contained within its four corners—a proposition that is diametrically opposed to any suggestion that all documents that relate to the policy are to be included in giving meaning to the policy's terms and the parties' intent. In fact, the *Textron* decision makes short shrift of this entire issue by stating:

> It is a well-settled rule that this court is bound to follow the rules for the construction of contracts when interpreting the terms of an insurance policy. *Malo v. Aetna Casualty and Surety Co.*, 459 A.2d 954, 956 (R.I. 1983). The language contained in a policy must be given its plain and ordinary meaning. *Id.* "When the terms are found to be clear and unambiguous, the task of judicial construction is at an end.

[4] That case is *Textron, Inc. v Aetna Casualty and Surety Co*, 638 A.2d 537, 539 (R.I. 1994), which Amica cites for the proposition that a court should construe all documents relating to an insurance contract in interpreting its provisions. Ms. Wagenmaker discusses this case below. The other case that Amica cites for this proposition is *McGowan v. Connecticut General Life*, 110 R.I. 17, 19 (1972) which Wagenmaker also discusses below.

> The contract terms must then be applied as written and the parties are bound by them." *Id.* Before this court can construe the terms of an insurance policy, we must first find that an ambiguity exists. *Amica Mutual Insurance Co. v. Streicker,* 583 A.2d 550, 551-52 (R.I. 1990). In our analysis to determine whether an ambiguity exists, we view the insurance policy as a whole and in its entirety. *Id.* at 552. When this court finds that an ambiguity exists or that the terms of an insurance contract are subject to more than one reasonable interpretation, the insurance contract will be strictly construed against the insurer. *Id.* "A court should not, however, stretch its imagination in order to read ambiguity into a policy where none is present." *Mullins v. Federal Dairy Co.*, 568 A.2d 759, 762 (R.I. 1990).

*Textron, supra* at 539 (the page that Amica cited for its own unsupported proposition of law). It is this statement of the law that must guide this Court's analysis and decision in this matter.

Ms. Wagenmaker respectfully submits, and Amica apparently agrees, that the Policy's language at issue in this action suffers from no ambiguity whatsoever. Rather, the plain and clear meaning is evident on the face of the Policy's terms at issue. Thus, as instructed by *Textron, id.*, "the task of judicial construction is at an end" and this Court is left with the task of simply applying that language to the facts of this case.

**<u>Counsel's analysis embodied in the November 5, 2007 letter to Amica.</u>**

Ms. Wagenmaker turns now to the analysis set forth in her counsel's letter of November 5, 2007, (Exhibit A), to show that the Policy language at issue compels a finding that she has UM coverage under the Policy. That letter notes in relevant part:

> While processing her claims against Safeco, the carrier that provided UM coverage to Ms. Wagenmaker[[5]],

[5] This refers to Ms. Wagenmaker's own insurance policy which insured her own vehicles. Amica makes a reference to this coverage which constitutes a transparent suggestion to this Court that its decision to deny Wagenmaker coverage under the Amica Policy will not leave her without recompense as the Safeco policy will step in. In addition to violating the collateral source rule, this approach stands as yet another example

I recently obtained a complete copy of Mr. Vitone's policy with Amica, Policy Number: 961138-23YV (hereinafter referred to as the "Policy") and have carefully reviewed Part C of the Policy which governs claims for UM coverage. I have also reviewed the Policy's Declarations Page that lists certain vehicles which Mr. Vitone owned at the time of the Accident. Finally, I analyzed this information against the backdrop of my understanding that the vehicle involved in the Accident, a 1998 Chevrolet Corvette listed as Auto No. 5 on the Policy's Declarations Page (hereinafter referred to as the "Vitone Vehicle"), had been removed from the Policy over the winter months, with coverage not having been replaced prior to the Accident. While it appears that Paragraph A. 1. of the Exclusions section of Part C of the Policy[6] might deny UM coverage to Mr. Vitone, we believe that the clear and unambiguous Policy terms would afford coverage to Ms. Wagenmaker for the serious injuries she sustained in the Accident. In this regard, I provide the following analysis with all citations and discussion of contract language meant to refer to the Policy.

First, Paragraph A of the Insuring Agreement in Part C [which Part contains the Policy language relating to UM coverage], provides that, if Ms. Wagenmaker is an **insured** under Part C, then Amica must pay to her compensatory damages for any bodily injuries that she received, to the extent that she is legally entitled to recover such compensation from the owner or operator of an **uninsured motor** vehicle. The only other requirement under this Paragraph is that the owner's or operator's liability must arise out of the ownership, maintenance or use of the **uninsured motor vehicle.** Those terms that I have placed in bold type above are defined in Paragraph B of Part C's Insuring Agreement. I turn now to these definitions.

Considering first whether the Accident involved an **uninsured motor vehicle,** I note that Paragraph C. 3. defines such a vehicle as including one:

---

of Amica's bad faith in the circumstances. If the Policy which it drafted, and for which it accepted premium payments, by its clear and plain terms affords her coverage, the fact that she had coverage of her own is utterly immaterial to Amica's exposure and Ms. Wagenmaker objects to this thinly veiled effort to affect this Court's objectivity by employing this disingenuous approach.

[6] I discuss this exclusion in more detail below, specifically its application to Ms. Wagenmaker.

3. Which is a hit-and-run vehicle whose operator or owner cannot be identified and which hits:

* * *

c. **Your covered auto.**

The Police Report concerning the Accident, as well as all witness statements known to us, establish that the Vitone Vehicle was struck in the rear by another vehicle that fled the scene and which has never been identified. As discussed more fully in the following paragraph, because the Vitone Vehicle was still designated as Auto No. 5 on the Declarations Page at the time of the Accident, it was a **covered auto.[7]** Thus, Ms. Wagenmaker suffered bodily injuries for which the owner or operator of an **uninsured motor vehicle** is legally liable. I turn now to a consideration of whether she was defined as an **insured** as, if she was, she is entitled, in the first instance, to coverage under Part C, unless otherwise excluded by the Policy's terms.

An **"insured"** is defined under Paragraph B. of Part C's Insuring Agreement. In addition to the named insured (Vito Vitone and Linda Vitone) Paragraph B. 2. includes within this definition, "[a]ny other person occupying **your covered auto**." Part C. does not contain a definition of the term **your covered auto,** thus requiring reference to Paragraph J. of the Policy's general Definitions section which begins on Page 1 of 14. Specifically, Paragraph J. 1. defines **your covered auto** as "[a]ny vehicle shown in the Declarations." Accordingly, as the Vitone Vehicle was shown in the Declarations on the date of the Accident, Ms. Wagenmaker was an **insured** for purposes of coverage under the Insuring Agreement of Part C unless that coverage was otherwise excluded. For that reason, I turn to the applicable exclusions under Part C.

We understand that the only basis upon which Amica has denied UM coverage for Mr. Vitone with respect to the Accident, is the fact that he had removed the Vitone Vehicle from the Policy after the Policy (including

[7] Plaintiff's counsel acknowledges that, at the time he wrote this letter, he was not working with the most recent Declarations Page, and that the most recent one does show for the Vitone Vehicle certain coverages as stated by Amica in its Memorandum while stating in the column for UM coverage "NOT COVERED." However, that in no way changes the validity of the analysis in the letter or this Memorandum as that vehicle was a "vehicle shown in the Declarations." Policy, General Definitions, Paragraph J.

the Declarations) was issued but before the Accident occurred. Presumably, in reaching this conclusion, Amica relied on Paragraph A. 1. of Part C's language governing Exclusions[8]which would require that we consider whether, under the Policy's language, this exclusion would apply to Ms. Wagenmaker, as well. With that in mind, I consider now the Exclusions provisions under Part C of the policy that begin on Page 7 of 14, thereof.

Paragraph A. 1. provides, in relevant part:

> A. We do not provide Uninsured Motorists Coverage for bodily injury sustained by:
>
> 1. By an **insured** while occupying, or when struck by, any motor vehicle owned by that **insured** which is not insured for this coverage under this policy.[9]

As is apparent, this section excludes coverage under Part C for an insured who is occupying a vehicle which is not insured for coverage under Part C, where that vehicle is owned by the insured. Thus, because Mr. Vitone owned the Vitone Vehicle, to the extent that there was no coverage on the Vitone Vehicle under Part C, he would be excluded from UM coverage. Of course, as Ms. Wagenmaker had no ownership or other interest in the Vitone Vehicle, this exclusion, **on its face,** would not apply to her. Accordingly,

---

[8] This is the very exclusion upon which Amica actually relies in its Memorandum to argue that Vitone has no entitlement to UM coverage. See Amica's Memorandum at pp. 13 – 14. As noted in the November 5, 2007 letter, the language of this exclusion would not, in any way, act to deny Ms. Wagenmaker coverage as the clear and plain meaning of the language excludes her from its application because she did not own the vehicle.

[9] This very language comprises Number 32 of Amica's Statement of Undisputed Facts, *See* Amica Memorandum at pp. 5 – 6. In insurance parlance, this provision is known as an "owned but not insured" clause. With regard to UM coverage in Rhode Island, the Supreme Court has held that such a provision does not, on its face, violate R.I.G.L § 27-7-2.1 that requires a carrier to offer UM coverage *Dellagrotta v. Liberty Mut. Ins. Co*., 639 A.2d 980 (R.I. 1994); *Employers' Fire Ins. Co. v. Baker*, 119 R.I. 734 (1978). The Supreme Court has also held that a carrier may exclude UM coverage when an insured is occupying a vehicle that is owned, not by that insured but by a family member, if it is not insured for this coverage. *Nationwide Mutual Insurance Company v. Viti*, 850 A.2d 104 (R.I. 2004). These cases, however, strictly construe the policy language with which they were concerned—language that differed from that at issue in this matter—in giving meaning to its terms. Such a strict constructionist approach would compel here a finding that Ms. Wagenmaker is entitles to UM coverage because the "owned but not insured" clause in the Policy excludes coverage to an insured when that insured is injured wile occupying a vehicle which ***that insured*** owns, if it is not insured for UM coverage under the Policy. That has absolutely nothing to do with Ms. Wagenmaker's claims in this action as ***she did not own the vehicle at issue and there is no allegation that she did.***

> we believe that Ms. Wagenmaker satisfied all requirements for coverage under Part C and that the Policy does not contain any language that would act to exclude this coverage.

As noted above, one can expend much energy searching Amica's Memorandum in vain for even the most vague or superficial attempt to refute this analysis. It simply is not there. What is crucial, though, is the fact that any good faith approach to contesting Ms. Wagenmaker's claims for UM coverage in this case must, at a minimum**,** address her careful analysis. This is so because if her analysis is wrong, she cannot be left to accept Amica's "say so" on that point but, rather, she is entitled to know why it is wrong. And, if it is correct, she cannot be put to this effort merely to obtain her rights under the Policy. Stated differently, if Amica really believes that Wagenmaker's analysis is wrong, it is required to articulate its reasons; if it does not believe it is wrong, it is required by law to say so and pay the claim. To bring everyone to this point and to then to ***ignore*** Ms. Wagenmaker's analysis should compel this Court to draw an adverse inference regarding Amica's true "state of mind."

One well-settled aspect of Rhode Island law regarding the interpretation if insurance policy language that Amica did not discuss in its Memorandum is contained in *Cumberland v. Interlocal Risk Mgmt. Trust,* 860 A.2d 1210 (R.I. 2004) where Justice Goldberg wrote for a unanimous court. After reaffirming the tenets that: (1) Rhode Island interprets insurance policies by using the same rules of interpretation that govern contracts, and; (2) the terms of the entire policy are to be given their "plain, ordinary and usual meaning', Justice Goldberg stated:

> "**The test to be applied is not what the insurer intended by his (sic) words, but what the ordinary reader and purchaser would have understood them to mean**." *Pressman v. Aetna Casualty and Surety Co.*, 574

> A.2d 757, 760 (R.I. 1990) (quoting *Elliott Leases Cars, Inc. v. Quigley*, 118 R.I. 321, 326, 373 A.2d 810, 812 (1977)).
>
> We will not deviate from the literal policy language unless we deem the policy to be ambiguous. *Pawtucket Mutual Insurance Co.*, 786 A.2d at 386 (citing *Sjogren v. Metropolitan Property & Casualty Insurance Co.*, 703 A.2d 608, 610 (R.I. 1997)).

*Cumberland*, *supra* at 1215 *(citing, Pressman v. Aetna Casualty and Surety Co.*, 574 A.2d 757, 760 (R.I. 1990); *quoting Elliott Leases Cars, Inc. v. Quigley*, 118 R.I. 321, 326, 373 A.2d 810, 812 (1977)). When one considers carefully the approach that Amica has taken in its Memorandum the reason that it chose to ignore the *Cumberland* decision develops a sharper focus. This is evident from Amica's consistent reliance on its solitary position in defending against Wagenmaker's claim—that is: it did not ***intend*** to afford UM coverage to the Vitone Vehicle. This is stated succinctly at page 19 of its Memorandum as follows:

> "The Court should reject Wagenmaker's attempt to misconstrue the plain language of the Policy because it is entirely inconsistent with **the expressed intent of the parties** to the contract.[[10]] Vitone requested the deletion of UM coverage and AMICA agreed to eliminate the coverage. The 1998 Chevrolet continued to appear in the Declarations pages because it was insured for OTC [other than collision] only.[[11]] It would be illogical to extend UM coverage to the 1998 Chevrolet simply because it was listed in the Declarations pages—especially where those same Declarations pages clearly state that such coverage does not exist for the vehicle.

[10] This, itself, is ambiguous. Does Amica mean that Wagenmaker's "attempt" is entirely inconsistent with the parties' expressed intent, or that the plain language is entirely inconsistent with the parties' expressed intent? Of course, the answer is not relevant to a resolution of the issues presented as it is the only plain language of the Policy that governs its construction irrespective of what the parties may have intended. *See* n. 15, *infra* where Ms. Wagenmaker discusses that, in any event, the parties to the Policy never had the intent that Amica now claims they did.

[11] The definition of "your covered auto" that is discussed a p. 7, *supra*, says absolutely ***nothing*** about why, where or how a vehicle is listed in the declarations. It merely defines this term to mean "***any vehicle*** shown in the Declarations." *See.* Policy, General Definitions, Paragraph J.

(Emphasis added).

Now, let us look again at Justice Goldberg's language in *Cumberland, supra:* " "The test to be applied is not what the insurer intended by his (sic) words, but what the ordinary reader and purchaser would have understood them to mean." When one follows this required approach, despite its protestations to the contrary, what Amica may have intended has absolutely no relevance to the resolution of this matter. Rather, under the *Cumberland* rule, one must consider ***only*** what the ordinary reader and purchaser would have understood the policy terms to mean. There is only ***one*** conclusion available on that issue as it relates to the Policy terms under consideration:

> A. We do not provide Uninsured Motorists Coverage for bodily injury sustained by:
>
> 1. By an **insured** while occupying, or when struck by, any motor vehicle owned by that **insured** which is not insured for this coverage under this policy.

If a person who is considered an insured under the policy sustains bodily injury while occupying a car that does not have UM coverage under the policy, that insured may still collect UM benefits ***unless he or she owns the car involved.*** That is, there are two requirements that must be met for the exclusion to apply: (1) the vehicle in which the insured was injured must not be insured for UM coverage under the Policy **and;** (2) the insured who is claiming UM benefits must have owned the vehicle. Here, there is absolutely no dispute on these issues as Wagenmaker and Amica agree that: (1) even if the Vitone Vehicle was not insured for UM coverage under the Policy on the date of the accident at issue; (2) Ms. Wagenmaker did not own the vehicle. Accordingly, despite

Amica's misguided reliance on its "intent", there is no way to construe this language other than in a manner that recognizes UM coverage for Ms. Wagenmaker.

This analysis is especially accurate when one considers that any intention by Amica to exclude UM coverage for someone in Ms. Wagenmaker's position could have been accomplished in a most simple, direct, clear, concise and unambiguous way. One option would have been simply to omit from the exclusion the words "owned by that insured".[12] The exclusion would then have read:

> A. We do not provide Uninsured Motorists Coverage for bodily injury sustained by:
>
> 1. By an **insured** while occupying, or when struck by, any motor vehicle which is not insured for this coverage under this policy.

If the exclusion appeared in this form, ***we would not be here.*** In that case, although Ms. Wagenmaker would still be an insured under the Policy because she was occupying an auto shown in the Declarations page, the exclusion for UM coverage would have applied to her in a plain, concise and unambiguous way. If that is what Amica intended, its omission of the ***four words*** "owned by that insured" would have succeeded in accomplishing that intent.[13]

---

[12] This argument is especially cogent when one considers that the function of an exclusion under an insurance policy is to remove from coverage ***something that has coverage in the first instance***. That is why exclusions appear at the end of policy sections. The earlier provisions of a section establish coverage while the exclusions negate that coverage in certain circumstances. This is consistent with the basic rule of contract construction which says that contract provisions are modified by others that come later in a contract.

[13] It should be noted that Rhode Island law would not allow these four words to be treated as mere surplusage. *See*, Andrukiewicz v. Andrukiewicz, 860 A.2d 235 (R.I. 2004) (When ascertaining the usual and ordinary meaning of contractual language, every word of the contract should be given meaning and effect; an interpretation that reduces certain words to the status of surplusage should be rejected) (citation omitted). *See, also*, *Mello v. Hamilton Fire Ins. Co.*, 71 R.I. 510 (1946) for an even more compelling statement on this point:

> In the circumstances of this case I am of the opinion that the selection and use by the insurer of both theft and larceny in the coverage clause

Alternatively, Amica could just as easily have provided a definition in Part C of the Policy, which establishes UM coverage, of the term "your covered auto" (as it did for the terms "insured" and "uninsured motor vehicle").[14] In so doing, it could have used the definition of this term contained in the Policy's general definition section which defines "your covered auto" as "[a]ny vehicle shown in the Declarations", and changed it to say: "for purposes of coverage under this Part C, **your covered auto** is defined as any vehicle shown in the Declarations which is insured for this coverage under the policy." Either approach would have placed squarely in the Policy, language that clearly, plainly and unambiguously accomplished what Amica now claims was its intent. That would have allowed this Court to arrive at the conclusion that Amica advances, in the way that the law requires, *i.e.*, by giving the Policy language its clear, plain and ordinary meaning. Just as the law mandates that ambiguous language be construed against the drafter, so, too, must it require that clear and unambiguous language be given its ordinary meaning

> of this policy, without an exception or definition of the meaning of either of those words, would reasonably lead a person, who understands language as ordinarily used in common speech, to believe that the policy, as written, covered any and all acts in violation of the criminal law that would unlawfully deprive him of his property, whether permanently or for an indefinite time. The word larceny in the policy under consideration should not be rejected as surplusage, for I cannot believe that the insurer used unnecessary language to define the all-important matter of the coverage intended by this contract of insurance. By using both theft and larceny in the coverage clause of this policy, it is reasonable, as above stated, to believe that such language was intended to extend to the insured a broader coverage than if the word larceny alone had been used; and that the only other coverage under the word theft, which would not be included under the word larceny, is the taking of an automobile without the owner's consent in violation of the above-cited statute.

[14] As noted above in the excerpt from counsel's November 5, 2007 letter to Amica, (Exhibit A hereto), Part C of the Policy ***does*** have a definition section that is contained in Paragraph B to that Part. In it, there is a definition of "insured" which is anyone occupying "your covered auto". However, there is ***no*** definition of "your covered auto" in this Paragraph which thus requires reference to the Policy's general definitions where that term is defined as "any vehicle shown in the Declarations." The Vitone vehicle ***was*** shown in the Declarations and that is ***all*** the Policy requires to satisfy the definition of this term..

***even when that meaning may differ from what the drafter intended.***[15] This is the teaching of *Cumberland, supra*; this is the rule that this Court must apply in the circumstances.

**CONCLUSION**

Eight months after Ms. Wagenmaker developed a careful analysis of the Policy language that governs the issue presented to this Court and shared that analysis with Amica in an effort to resolve this controversy without burdening this Court, Amica has made what can only be called a half-hearted effort to demonstrate why Ms. Wagenmaker has no UM coverage under the Policy for her devastating injuries. She and her counsel waited with great anticipation for Amica's Memorandum to see what her counsel must have missed either in his analysis of the Policy's terms or the law that governs their interpretation. The answer turned out to be "nothing". What the Policy says is clear; Amica's argument that it does not mean what it says is interesting at best, but it has no bearing on this action. As Justice Goldberg said in *Cumberland*:

> "The test to be applied is not what the insurer intended by his words, but what the ordinary reader and purchaser would have understood them to mean."

For Amica to confine its argument to what it intended, in the face of this judicial language, compels one to wonder about the propriety of Amica's conduct.[16]

---

[15] Wagenmaker strenuously argues that, despite Amica's protestations to the contrary, it did ***not*** intend to deny coverage to her in these circumstances. In support, Wagenmaker notes that Amica has pointed to absolutely nothing to support its current claim that it did not intend to afford her this coverage. Rather, every one of its statements regarding this claimed "intent" is wholly unsupported—the intent is thus taken as the starting point; not a conclusion to be drawn from offered premises. And, although, it refers more than once to the intention of the parties which, of course, would be Amica and Vitone, that this vehicle not have UM coverage, the policy says otherwise. Indeed, the language says that Vitone as owner of the vehicle would have no UM coverage but that all other **"insureds"** would. Even if the Policy language were to be used as a guide to what the parties intended, which the *Cumberland* Court *supra* says should not be done because this is irrelevant, (see p. 7, *supra*) then Wagenmaker's interpretation must still prevail.

For the reasons and authorities set forth above, Plaintiff Joyce Wagenmaker respectfully submits that she is entitled to judgment against Amica as a matter of law, establishing that she has Uninsured Motorists coverage under the Policy.

Plaintiff
By her Attorney

___/s/ David J. Oliveira___
DAVID J. OLIVEIRA, ESQ. #2516
155 South Main Street Suite 305
Providence, RI 02903
(401) 274-9191
(401) 274-9190 (Fax)
doliveira@djolaw.com

Date: ______09/15/08________

**CERTIFICATION**

I hereby certify that the within was electronically filed with the Court using the ECF system. The following counsel of record are registered with the Court and will be

---

[16] Unfortunately, this approach implicates the provisions of Fed.R.Civ.P. 11(b) which states, in relevant part:

> (b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper — whether by signing, filing, submitting, or later advocating it — an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

Amica's approach has certainly caused delay and the result may well show that it was unnecessary. So too has it increased the cost of litigation. Whether its claims, defenses or other legal contentions were warranted by existing law also remains to be seen. But, when one considers where this matter is and how it got to be there, these aspects of Rule 11 tend to come to mind.

served electronically through the ECF system: **Nicole J. Todesco, Esq.,** Sloane & Walsh, LLP, Three Center Plaza, 8th Floor, Boston, MA 02108 and **Todd D. White, Esq.,** Adler Pollock & Sheehan, P.C., One Citizens Plaza, 8th Floor, Providence, RI 02903 on this 15th day of September.

___/s/ David J. Oliveira_____

# Exhibit A

David J. Oliveira, Esq.
Attorney & Counsellor at Law
155 South Main S
Provid
ph.
fax.
delivei
w
Admitted in RI & MA

**Exhibit A**

November 5, 2007

Mr. Robert Reifel, CPCU
Sr. Claims Supervisor
Amica
P.O. Box 6008
Providence, RI 02940-6008

***Re: Vito Vitone/ File No. L99200605081***
***Accident of July 3, 2006***

Dear Mr. Reifel:

This firm is legal counsel to Joyce Wagenmaker with regard to an automobile accident which occurred on July 3, 2006 on Route 95 North in Warwick, Rhode Island (the "Accident"). At that time, Ms. Wagenmaker was a passenger in a vehicle owned and operated by your insured, Vito Vitone of West Warwick, Rhode Island who, we understand, promptly notified Amica of the Accident and made a claim for UM coverage with respect thereto. I am in receipt of your letter of May 30, 2007 to Todd White, Mr. Vitone's counsel, in which you reaffirm Amica's denial of UM coverage to Mr. Vitone with respect to the Accident. I write to you now to address claims by Ms. Wagenmaker for UM coverage under Mr. Vitone's policy of insurance.

While processing her claims against Safeco, the carrier that provided UM coverage to Ms. Wagenmaker, I recently obtained a complete copy of Mr. Vitone's policy with Amica, Policy Number: 961138-23YV (hereinafter referred to as the "Policy") and have carefully reviewed Part C of the Policy which governs claims for UM coverage. I have also reviewed the Policy's Declarations Page that lists certain vehicles which Mr. Vitone owned at the time of the Accident. Finally, I analyzed this information against the backdrop of my understanding that the vehicle involved in the Accident, a 1998 Chevrolet Corvette listed as Auto No. 5 on the Policy's Declarations Page (hereinafter referred to as the "Vitone Vehicle"), had been removed from the Policy over the winter months, with coverage not having been replaced prior to the Accident. While it appears that Paragraph A. 1. of the Exclusions section of Part C of the Policy[1] might deny UM coverage to Mr. Vitone, we believe that the clear and unambiguous Policy terms would afford coverage to Ms. Wagenmaker for the serious injuries she sustained in the Accident. In this regard, I provide the following analysis with all citations and discussion of contract language meant to refer to the Policy.

[1] I discuss this exclusion in more detail below, specifically its application to Ms. Wagenmaker.

David J. Oliveira, Esq.
Attorney & Counsellor at Law



First, Paragraph A of the Insuring Agreement in Part C, provides that, if Ms. Wagenmaker is an **insured** under Part C, then Amica must pay to her compensatory damages for any bodily injuries that she received, to the extent that she is legally entitled to recover such compensation from the owner or operator of an **uninsured motor** vehicle. The only other requirement under this Paragraph is that the owner's or operator's liability must arise out of the ownership, maintenance or use of the **uninsured motor vehicle.** Those terms that I have placed in bold type above are defined in Paragraph B of Part C's Insuring Agreement. I turn now to these definitions.

Considering first whether the Accident involved an **uninsured motor vehicle,** I note that Paragraph C. 3. defines such a vehicle as including one:

> 3. Which is a hit-and-run vehicle whose operator or owner cannot be identified and which hits:
>
> * * *
>
> c. **Your covered auto.**

The Police Report concerning the Accident, as well as all witness statements known to us, establish that the Vitone Vehicle was struck in the rear by another vehicle that fled the scene and which has never been identified. As discussed more fully in the following paragraph, because the Vitone Vehicle was still designated as Auto No. 5 on the Declarations Page at the time of the Accident, it was a **covered auto.** Thus, Ms. Wagenmaker suffered bodily injuries for which the owner or operator of an **uninsured motor vehicle** is legally liable. I turn now to a consideration of whether she was defined as an **insured** as, if she was, she is entitled, in the first instance, to coverage under Part C, unless otherwise excluded by the Policy's terms.

An **"insured"** is defined under Paragraph B. of Part C's Insuring Agreement. In addition to the named insured (Vito Vitone and Linda Vitone) Paragraph B. 2. includes within this definition, "[a]ny other person occupying **your covered auto.**" Part C. does not contain a definition of the term **your covered auto,** thus requiring reference to Paragraph J. of the Policy's general Definitions section which begins on Page 1 of 14. Specifically, Paragraph J. 1. defines **your covered auto** as "[a]ny vehicle shown in the Declarations." Accordingly, as the Vitone Vehicle was shown in the Declarations on the date of the Accident, Ms. Wagenmaker was an **insured** for purposes of coverage under the Insuring Agreement of Part C unless that coverage was otherwise excluded. For that reason, I turn to the applicable exclusions under Part C.

We understand that the only basis upon which Amica has denied UM coverage for Mr. Vitone with respect to the Accident, is the fact that he had removed the Vitone Vehicle from the Policy after the Policy (including the Declarations) was issued but before the Accident occurred.

David J. Oliveira, Esq.
Attorney & Counsellor at Law

Mr. Robert Reifel, CPCU
Page 3
November 5, 2007

Presumably, in reaching this conclusion, Amica relied on Paragraph A. 1. of Part C's language governing Exclusions which would require that we consider whether, under the Policy's language, this exclusion would apply to Ms. Wagenmaker, as well. With that in mind, I consider now the Exclusions provisions under Part C of the policy that begin on Page 7 of 14, thereof.

Paragraph A. 1. provides, in relevant part:

> A. We do not provide Uninsured Motorists Coverage for bodily injury sustained by:
>
> 1. By an **insured** while occupying, or when struck by, any motor vehicle owned by that **insured** which is not insured for this coverage under this policy.

As is apparent, this section excludes coverage under Part C for an insured who is occupying a vehicle which is not insured for coverage under Part C, where that vehicle is owned by the insured. Thus, because Mr. Vitone owned the Vitone Vehicle, to the extent that there was no coverage on the Vitone Vehicle under Part C, he would be excluded from UM coverage. Of course, as Ms. Wagenmaker had no ownership or other interest in the Vitone Vehicle, this exclusion, **on its face,** would not apply to her. Accordingly, we believe that Ms. Wagenmaker satisfied all requirements for coverage under Part C and that the Policy does not contain any language that would act to exclude this coverage.

Based on the foregoing analysis of Policy terms that are clear and unambiguous, we hereby make demand that Amica acknowledge Ms. Wagenmaker's entitlement to UM coverage under the Policy, for the bodily injuries that she sustained in the Accident. Once we receive such acknowledgement, I shall provide to you promptly a comprehensive demand for settlement. In the interim, kindly call with any specific questions or comments that you may have.

Sincerely,

David J. Oliveira, Esq.

DJO: nlp
cc: Mr. David Reeves, Safeco Insurance Company of Illinois

# Exhibit B

**Exhibit B**

Amica
AUTO HOME LIFE

100th ANNIVERSARY

CORPORATE OFFICE
One Hundred Amica Way
Lincoln, Rhode Island 02865-1156
Mail: PO Box 6008, Providence, RI 02940-6008
Toll-free: 1-800-62-Amica (1-800-622-6422)
Claims Fax: 1-866-774-3318
Sales/Service Fax: 1-401-333-4610

November 8, 2007

David J. Oliveira, Esq.
155 Main Street, Suite 305
Providence, RI 02903

RECEIVED
NOV 09 2007
David J. Oliveira, Esq.

Re:
File Number: L99200605081
Our Insured: Vito Vitone
Your Client: Joyce Wagonmaker
Date of Loss: July 3, 2006

Dear Mr. Oliveira:

I have your letter of November 5th relating to your claim that Joyce Wagonmaker is entitled to UM coverage from the Amica Personal Automobile Policy issued to Vito Vitone's. This is the first notice we had received that Ms. Wagonmaker was presenting a claim under Mr. Vitone's policy. As you indicate in your letter, we had previously denied coverage under this policy to Mr. Vitone.

We are reviewing the points that you make in your letter and will respond shortly. If you have any questions or comments that you would like to discuss, please call me. In the meantime, I would appreciate it if you would provide me with any information you may have concerning the damages that your client sustained in this accident.

Sincerely yours,

Robert Reifel

Robert Reifel, CPCU
Sr. Claims Supervisor
Email: rreifel@amica.com

RTR

# Exhibit C

**Exhibit C**

Amica
AUTO HOME LIFE

CORPORATE OFFICE
One Hundred Amica Way
Lincoln, Rhode Island 02865-1156
Mail: PO Box 6008, Providence, RI 02940-6008
Toll-free: 1-800-62-Amica (1-800-622-6422)
Claims Fax: 1-866-774-3318
Sales/Service Fax: 1-401-333-4610

December 5, 2007

David J. Oliveira, Esq.
135 South Main Street, Suite 305
Providence, RI 02903

RECEIVED
DEC 06 2007
David J. Oliveira, Esq.

Re:
File Number: L99200605081
Our Insured: Vito Vitone
Your Client: Joyce Wagenmaker
Date of Loss: 07/03/06

Dear Mr. Oliveira:

I am writing to respond to your November 5, 2008 correspondence concerning the above-reference matter.

After careful and thoughtful consideration of the information and contentions contained in your letter, I regret to inform you that the Personal Auto Policy (Policy No 961138-23YV) issued by AMICA Mutual Insurance Company affords no coverage for claims arising out of the July 3, 2006 motor vehicle accident. More specifically, there is no coverage under the policy for your client's claim for Uninsured Motorist ("UM") benefits.

Independent of the application of the Policy exclusion you have referred to, coverage is lacking in this matter in light of the following circumstances:

In October of 2005, Vito Vitone contacted AMICA and requested the deletion and elimination of all coverages (except "Other Than Collision" coverage) for his 1998 Chevrolet Corvette. Consistent with this request, AMICA then made the necessary changes and a new policy was issued with the corresponding reductions in premium. AMICA also provided Mr. Vitone with written confirmation of the elimination of coverages via correspondence dated October 13, 2005. The correspondence included a "Coverage Confirmation" which indicated that Liability, Medical Payments, Collision Loss and Uninsured Motorists Coverage were "not covered." Simply put, the insurance contract was modified and these coverages were removed.

Because all coverages (except "Other Than Collision" coverage) were eliminated for 1998 Chevrolet Corvette prior to the subject accident, there is no coverage for any UM claim presented by or on behalf of your client. Simply put, such coverage did not exist for this vehicle.

In closing, please note that AMICA does not and should not be deemed to have waived all or any rights or grounds it may have in connection with the above-referenced policy, nor should it be deemed to be estopped from asserting all or any coverage defenses that are currently available under the policy or any defenses which may become applicable in this matter. No act of AMICA shall be construed as an admission of liability or as an admission or coverage.

Should you have any additional information or arguments which you believe bear on our coverage determination, or should you have any questions, please do not hesitate to contact me.

I will be available to you to discuss the position we have taken. Should you, however, wish to contact the Rhode Island Insurance Division regarding this matter, it maintains a section to investigate Complaints at 223 Richmond Street, Providence, RI, 02903, The Rhode Island Insurance Division can be contacted by telephone at 401-277-2223.

The above paragraph is required by Rhode Island Regulations.

Thank you.

Sincerely yours,

Robert Reifel, CPCU
Sr. Claims Supervisor
Email: rreifel@amica.com

RTR

Cc: David Reeves, Safeco Insurance Company of Illinois